IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANONYMOUS, | ) | 8:04CV269 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| GORDON KEENE VELLA, | ) | |
| FELLOWSHIP BAPTIST CHURCH, | ) | |
| A Non-Profit Corporation, BAPTIST | ) | |
| BIBLE FELLOWSHIP | ) | |
| INTERNATIONAL, A Non-Profit | ) | |
| Corporation, and | ) | |
| NEW HOPE BAPTIST CHURCH, | ) | |
| A Non-Profit Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

This action is brought by an adult female[1] against her father (Gordon Vella) and two churches which her father served as pastor while he was allegedly abusing her: Fellowship Baptist Church ("Fellowship") and New Hope Baptist Church ("New Hope"). The plaintiff alleges that Vella sexually abused her on multiple occasions, beginning when she was age three and ending when she was age twelve. During a portion of this time, Vella was a pastor at Fellowship or New Hope. The complaint asserts that Vella is liable to the plaintiff for intentional infliction of emotional distress and negligence. It further asserts that the two churches were negligent in hiring and supervising Vella and in failure to warn "the congregation."

This action is before the court upon motions for summary judgment brought by Fellowship and New Hope. They seek summary judgment for the reasons that the

---

[1]The plaintiff was given leave to proceed under the pseudonym "Anonymous." (Filing 41.) I have done my best not to identify her any more than is necessary.

statute of limitations bars this suit and the negligence claims have no merit.  Gordon Vella requested (filing 185) and was granted (filing 187) leave to join the portions of the New Hope and Fellowship motions for summary judgment seeking summary judgment on statute of limitations grounds.

I will deny the motions on the statute of limitations question.  I will grant the motions as to the merits of the negligence claims against the churches.  In granting summary judgment to the churches, I assume that the alleged abuse by Vella occurred, but I also decide that the undisputed material facts do not permit a finding that the churches are liable in negligence to Plaintiff.

This decision is not intended to, and could not, minimize the alleged abuse.  Nor is it a finding that Vella sexually abused his child.  Those questions are not now before me.

## I.  FACTS

Fellowship and New Hope each set forth a statement of material facts in their briefs supporting summary judgment.  Plaintiff did not contest New Hope's statement of facts, and contested the substance of only one paragraph of Fellowship's statement of facts.  Pursuant to NECivR 56.1(b)(1), the uncontested facts in the moving parties' briefs are deemed admitted.[2]

---

[2]The two churches submitted facts in support of their motions acknowledging that Gordon Vella sexually abused Plaintiff.  Vella has joined in the motions only for purposes of deciding the statute of limitations issue, and I do not consider Vella to have admitted that he committed the sexual abuse.  The factual findings herein are binding on Vella only to the extent necessary to decide the statute of limitations issue.  These factual findings have no bearing on the merits of the negligence and intentional infliction of emotional distress claims against Vella.

Except on the statute of limitations question, the material facts are undisputed. The relevant facts are set forth below.[3]

### The Parties

1.     Plaintiff was born on April 1, 1973.  She reached twenty-one years of age on April 1, 1994.  This suit was removed from state court to this court on June 9, 2004.  (Fellowship Facts 1, 3; filing 1.)

2.     Defendant Gordon Keene Vella ("Vella") is a former Baptist pastor and is the biological father of Plaintiff.  (Fellowship Facts 10.)

3.     Defendant Fellowship Baptist Church ("Fellowship") is an Independent Baptist Church where Vella was a pastor from approximately June 1979 to early December 1981.  (Fellowship Facts 11.)

4.     Defendant New Hope Baptist Church ("New Hope") was an Independent Baptist Church where Vella was a pastor from approximately December 1981 or

---

[3]For ease of citation and in the interest of brevity, I cite directly to the admitted facts in the statements of fact submitted by the churches without additional reference to the pinpoint citations to the record.  I have reviewed the pinpoint citations in the facts submitted by the churches and find them to be accurate.  I have reordered and in some instances shortened those facts.

Citations to the Fellowship statement of facts refer to the numbered paragraphs in the statement of facts in its brief in support of its motion (filing 172), hereinafter cited as "Fellowship Facts ___."  Similarly, citations to the New Hope statement of facts refer to its brief (filing 195), hereinafter cited as "New Hope Facts ___."

I cite pinpoint references to the record in support of other material undisputed facts.  I include in my findings of material undisputed facts those additional facts submitted by Plaintiff which were material and supported by pinpoint references.

January 1982 to late 1984.  (Fellowship Facts 12, 40 & 41.)  New Hope was dissolved sometime thereafter and is no longer operational.  (New Hope Facts 28.)  Despite the dissolution, New Hope has presented a defense through separate counsel.

5.     Summary judgment in favor of Defendant Baptist Bible Fellowship International ("BBFI") was granted, with the approval of Plaintiff, in September 2005 and a Rule 54(b) judgment was entered in favor of BBFI.  (Filings 167, 168.)

6.     This Court has jurisdiction based on diversity of citizenship. (Fellowship Facts 14.)

### *Vella's Marriage and His Pre-Nebraska Misconduct*

7.     On December 12, 1969, Gail Vella ("Gail") and Gordon Vella ("Vella") were married.  (Fellowship Facts 23.)

8.     From 1971 through 1973, the Vellas lived in Sarcoxie, Missouri, where Vella served as pastor of the Sarcoxie Baptist Church.  After leaving Sarcoxie, Gail learned that Vella had allegedly attempted to "rub the thighs" of their fourteen-year-old female babysitter.  Fellowship was never informed of this incident.  (Fellowship Facts 24; Gail Vella Dep. 14:5-17:8.)

9.     The Vellas then moved to Lebanon, Missouri, where Vella served as associate pastor at the Tabernacle Baptist Church for approximately two years.  This church was never informed of the Sarcoxie babysitter incident.  (Fellowship Facts 25.)

10.    The Vellas then moved to Cincinnati, Ohio, where Vella served as associate pastor at the Tabernacle Baptist Church.  That church was never informed of the incident involving the Sarcoxie babysitter. (Fellowship Facts 26.)

11.     From Cincinnati, the Vellas moved to Lafayette, Indiana, where Vella served as pastor for two churches, Faith Baptist Church and Lafayette Baptist Church. During his tenure at Lafayette Baptist, Vella allegedly engaged in a consensual, extramarital affair with an adult parishioner named Gayle Marquess. Neither of the two churches were informed of the incident involving the Sarcoxie babysitter or the alleged affair with Ms. Marquess. (Fellowship Facts 27.)

12.     After the affair with Ms. Marquess, the Vellas separated for a short period of time and Gail returned to her childhood home in Springfield, Missouri and lived with her parents. (Fellowship Facts 28.)

13.     In 1976, the Vellas reunited and moved to Aurora, Missouri where Vella served as pastor of the Aurora Baptist Church. That church was never informed of the incident involving the Sarcoxie babysitter or the alleged affair with Ms. Marquess. (Fellowship Facts 29.)

14.     During his tenure at Aurora Baptist Church, Vella engaged in a consensual, extramarital affair with an adult parishioner named Terese Murphy. Neither Aurora Baptist Church nor Fellowship was informed of the affair with Ms. Murphy. (Fellowship Facts 30.)

15.     During the summer of 1979, Vella applied for a position as pastor at Fellowship. (Fellowship Facts 31.)

16.     At the time Vella applied to Fellowship, no one knew about his two prior affairs or the Sarcoxie babysitter incident. No one knew of any claimed sexual abuse perpetrated on children or Plaintiff. In fact, Gail told Fellowship nothing of these prior events and instead presented the image of a happily married couple. (Fellowship Facts 32.)

17.     Prior to obtaining the position at Fellowship in 1979, Vella is unaware of any police records regarding him.  (Fellowship Facts 22.)

### The Lincoln Years

18.     In June of 1979, the Vellas moved to Lincoln, Nebraska, and Vella served as the pastor at Fellowship until early December 1981.  (Fellowship Facts 22.)

19.     At some point in 1980, rumors circulated that Vella had engaged in inappropriate conduct with a girl named Sarah Logan.  At the time, Logan was fourteen or fifteen years old.  On July 25, 1980, Ms. Logan submitted a report to the Lincoln Police Department and claimed that Vella had exposed himself to her and attempted to touch her leg.  She later claimed that Vella inadvertently "brushed" against her breast.  However, no sexual contact whatsoever occurred between these two.  (Fellowship Facts 34; Filing 175 [Logan Dep.] 8:23-9:4.)

20.     Other than the report to the Lincoln Police Department, the only persons that Ms. Logan supposedly told of these events were two of her friends, one of whom was Ms. Brenda Beem, the daughter of Mr. Rudy Wright.  Mr. Wright was once a member of Fellowship, but was not a member of Fellowship when Ms. Logan allegedly told Ms. Beem about Vella.  Ms. Beem denies speaking with Ms. Logan regarding the events, and Ms. Beem and Mr. Wright deny ever discussing the events. (Fellowship Facts 35.)

21.     Ms. Logan admits that she never told anyone at Fellowship of the inappropriate conduct and that she never specifically spoke with Mr. Wright. (Fellowship Facts 36.)

22.     Vella was never contacted by the police with respect to the Sarah Logan incident, and no charges, arrests or convictions resulted.  (Fellowship Facts 37.)

23.    In July 1981, Vella was involved in an incident in which he exposed himself to an adult seamstress whom he had hired to make a swimsuit.  Vella was ultimately charged and convicted of this crime on December 9, 1981.  (Fellowship Facts 38; Filing 213, Ex. 18 at p. 35.)

24.    In late October, 1981, and as part of follow-up work on the incident involving Vella's indecent exposure to the seamstress, the county attorney's office advised a police detective that it had information that a female teenager named Angel Niedfeld had some type of inappropriate contact with Vella. The detective interviewed Niedfeld on November 4, 1981.  She indicated that in the summer of 1980, she was having multiple problems and went to Vella for counseling.  Sometime in June, 1980, Vella grabbed Niedfeld's hand and placed it on his penis.  About a month later, he tried to kiss her and placed his hand down her shirt and felt her breast.  Several times later, Vella asked her to view his body in the nude.  Shortly thereafter, Niedfeld was hospitalized.  Neidfeld reported these incidents to her mother, and recounted that her mother was reluctant to call the police out of concern for the church.  (Filing 213, Ex. 13 [Ragatz Dep.], CM/ECF document 213-12, at pp. 4-6.)

25.    The detective's report recounts that Neidfeld "indicated . . . that . . . some congregation members found out where Gordon Vella used to live, either I think in Illinois or Wisconsin or possibly even somewhere in Kansas City, where he was at just prior to coming to the First Baptist Church in Lincoln that he also had the same problem with female individuals so it's apparently something that's been going on for quite sometime."  (Filing 213, Ex. 13 [Ragatz Dep.], CM/ECF document 213-12, at p. 6.).

26.    At some point during his time in Lincoln, Nebraska, Vella engaged in a consensual, extramarital affair with an adult parishioner then named Susie Johnson and now known as Laura Wright.  Ms. Johnson told no one of the affair.  (Fellowship Facts 42; Filing 175, Laura Wright Dep. 5:10-18.)

27.     On December 9, 1981, Vella resigned from Fellowship.  (Fellowship Facts 39.)

28.     Vella was without a church until late January 1982.  Fellowship parishioners who thought Vella was mistreated in the swimsuit seamstress incident formed New Hope.  Vella pastored New Hope from approximately late January 1982 to late 1984.  (Fellowship Facts 40, 41; Filing 224 [Johnson Dep.] 12:14-20, 35:22.)

29.     In 1984, Gail moved back to Springfield, Missouri with the children.  In May 1984 the Vellas separated and on May 15, 1985 they divorced.  (Fellowship Facts 43.)

### The Sexual Abuse of Plaintiff

30.     Vella sexually abused Plaintiff on multiple occasions from 1976 through 1984.   (Fellowship Facts 49.)   She claims the abuse began when she was approximately three years old and that the abuse occurred in Indiana, Missouri, and Nebraska.  The Nebraska abuse occurred while her father was a pastor at Fellowship or New Hope.  (Fellowship Facts 15.)

31.     The abuse took many forms, including digital penetration, oral sex, and vaginal sex, as well as forcing Plaintiff to watch him lift weights naked, assist him in masturbation, view pictures of women dressed in lingerie, and pose for naked photographs.  (Fellowship Facts 50.)

32.     Vella sexually abused Plaintiff in private.  None of the abuse occurred at a church. (Fellowship Facts 17,18, 52.).  All but one instance of abuse described by Plaintiff during her deposition occurred in whatever home the family lived in at the time.  Once incident occurred while Plaintiff was on a bike ride with Vella. (Fellowship Facts 51.)

33.     As Plaintiff's father, Vella was in a position of parental authority, which allowed him to continue his sexually abusive behavior.  During the times he sexually abused his daughter, Vella was acting as her father and not as her pastor.  (Fellowship Facts 21, 52.)

## Facts Relevant to Tolling of Statute of Limitations

34.     In November, 1985, Plaintiff spent the night at a friend's house.  She said something to the friend which caused the friend to relay concern to the friend's mother (the "Overnight Incident").  Although it is unclear whether Plaintiff told her friend that she had been sexually abused, Plaintiff said or did something that caused concern.  The friend's mother contacted a counselor at the church the two families attended.  That counselor contacted Gail, and Gail and Plaintiff met with the counselor over concerns expressed at the Overnight Incident. (Filing 175, Ex. A [Pl.'s Dep.] 89:5-90:16; Filing 175, Ex. B [Gail Vella Dep.] 105:19-106:18.)

35.     On November 8, 1985, Plaintiff and Gail filed a report with the Springfield, Missouri Police Department.  Other than what may have been said during the Overnight Incident, the 1985 police report was the first time Plaintiff claimed that Vella had sexually abused her on numerous occasions.  (Fellowship Facts 44.)

36.     In her statement to the Springfield police, Plaintiff said she had engaged in sexual intercourse with her father and that she understood the term "intercourse" to mean penetration of the male's sex organ into the woman's sex organ.  (Fellowship Facts 56.)

37.     In the report, Plaintiff stated that the most recent act of intercourse with her father occurred in May or June of 1984.  She reported that she had engaged in sexual intercourse with her father on three to four occasions prior to that date and performed oral sex at his demand.  (Fellowship Facts 57.)

38.     Prior to this time, and other than what may have been said during the "overnight incident," no one had any knowledge that Vella had sexually abused Plaintiff.  (Fellowship Facts 45.)

39.     Plaintiff's mother was not present during the times that Vella sexually abused her.  Plaintiff did not tell anyone about her father's sexual abuse until she was approximately twelve years old.  (Fellowship Facts 19.)

40.     After making the 1985 police report, Plaintiff received counseling on a weekly basis for a period of approximately six months.  (Fellowship Facts 58.)  She was treated at the Burrell Behavioral Health Center (although the records of that treatment are lost).  (Filing 213 [Mario Scalora Aff.] at CM/ECF p. 19.)

41.     After Plaintiff reported the sexual abuse to the Springfield police department, Plaintiff made a conscious decision to not relay information about the abuse to anyone again because she feared losing her friends and nothing was done about the abuse despite her report to the police. (Fellowship Facts 55.)

42.     Plaintiff claims that at some time after the 1985 police report and subsequent counseling, she completely blocked the memory of the abuse, the memory of the police investigation, and the memory of the counseling sessions.  She claims that she first remembered the abuse on January 8, 2003 in a counseling session. (Filing 213-4 [Scalora Aff.] at CM/ECF pp. 19-21, 26.)

43.     Among other things, and although he was unwilling to express an opinion on her claims of repressed memory, Dr. Mario Scalora is of the opinion that Plaintiff's alleged sexual abuse caused her to suffer from "extensive posttraumatic symptoms" that caused a "substantial impediment to" her "coming forward to address her claims."  (Filing 213-4 [Scalora Aff.] at CM/ECF p. 27.)

44.     Based upon an extremely detailed affidavit and report explaining the scientific evidence supporting the theory of repressed memory, Dr. Daniel Brown is of the opinion that "repressed memory" (sometimes called "dissociative amnesia") as applied to child abuse victims like Plaintiff is well founded scientifically and generally accepted by treating mental health practitioners.[4]   Furthermore, and after extensive testing and examination of Plaintiff, Dr. Brown is also of the opinion that she "suffers from a spectrum of mental disorders that specifically impair memory retrieval, namely dissociative disorders ranging from dissociative amnesia to dissociative identity disorder, that prevented her from bringing legal action against the defendant until she began recovering the sexual abuse memories in December 2002 and January 2003." (Id. at CM/ECF p. 45.) Finally, Dr. Brown believes that the memory loss first developed when Plaintiff was a minor.  (Id. at CM/ECF pp. 29-30 (Despite Plaintiff's report to the police, "[t]here is no evidence that she retained the memory for specific abuse incidents over nearly two decades until recently recovering some of those abuse memories.").)

45.     Prior to the 1985 police report, Gail was never concerned about leaving Vella alone with any of their children.  (Fellowship Facts 46.)  Nor was she even suspicious that Vella was sexually abusing the children.  (Fellowship Facts 47.)

46.     Gordon Vella physically abused his wife Gail while they lived in Lincoln.  Plaintiff witnessed incidents of her father's physical abuse of her mother. (Filing 175, Ex. A [Pl.'s Dep.] 95:13-99:1.)  Gordon Vella was authoritative, and the children were afraid of him.  (Filing 175, Ex. B. [Gail Vella Dep.] 99:23-105:13; Ex. 2 [Pl.'s Dep.].)

---

[4]For purposes of summary judgment, Dr. Brown has jumped over the Daubert hurdle.  See, e.g., Duffy v. Father Flanagan's Boy's Home, 2006 WL 208832, at *4 & n.4 (D. Neb. 2006) (discussing Daubert v. Merrel Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and the scientific validity of "repressed memory" evidence).

47.     During the period Plaintiff had allegedly repressed her memories of Vella's sexual abuse, Vella apologized to her for "being a bad dad" and Plaintiff understood this to be a reference to "the physical abuse and being mean to me, being mean to my mom, leaving us."  (Filing 175, Ex. A [Pl.'s Dep.] 220:1-12.)

### *Church Hiring Practices*

48.     Each Independent Baptist Bible Church is independent and has the absolute right of self-governance.  (Fellowship Facts 68.)

49.     There is no Independent Baptist Bible Church hierarchy that establishes rules, regulations, or any kind of procedure to check out pastors before they are hired because each church is an autonomous body of believers and no ecclesiastical entity has any control over each individual church to set down rules.  (Fellowship Facts 69.)

50.     Within each Independent Baptist Bible Church, the pastor is the ultimate authority and answers only to God.  (Fellowship Facts 70.)

51.     Vella obtained the position with Fellowship by participating in an informal interview process and delivering a sermon to the congregation.  (Fellowship Facts 73.)

52.     A "pulpit committee" comprised of several church members met with Vella and Gail.  The pulpit committee also interviewed Vella, engaged in a question-and-answer session with Vella, and met Vella for dinner and conversation.  (Fellowship Facts 74.)

53.     The pulpit committee also received four letters of recommendation submitted on behalf of Vella, which were each read to the congregation.  (Fellowship Facts 75.)

54.     The members of Fellowship had an opportunity to meet and speak with Vella.  There was also a discussion amongst church members about whether Vella suited their needs.  (Fellowship Facts 77.)  The members of the church then voted and decided to hire Vella as their pastor.  (Fellowship Facts 78.)

55.     Before Vella was hired, two or three other potential pastors were considered by Fellowship.  (Fellowship Facts 79.)

56.     The hiring process at Fellowship was the same as that used by all the other Independent Baptist Churches where Vella was hired.  (Fellowship Facts 81.)

57.     Although she was present during the interview process at Fellowship, Gail told Fellowship nothing about Vella's prior infidelities or sexual abuse.  (Fellowship Facts 82.)  Specifically, Gail Vella never reported the Sarcoxie babysitter incident or either extramarital affair that preceded Vella's move to Lincoln.  (Filing 175, Ex. B. [Gail Vella Dep.] 52:20.)

58.     New Hope was founded by members of Fellowship Baptist who thought Vella was treated unfairly in connection with the indecent exposure conviction.  (Filing 224 [Johnson Dep.] 12:14-20, 35:22.)

59.     There was no investigation conducted by the founders of New Hope into Vella's past.  (Filing 224 [Johnson Dep.] 35:23-36:2.)

60.     Although she was in the best position to observe Vella's behavior, Gail was totally unaware until Plaintiff's 1985 police report that Vella had been sexually abusing Plaintiff throughout their marriage.  (Fellowship Facts 48.)

## II.  ANALYSIS

### A.  STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Such a showing shifts to the non-moving party the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Further, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-moving party—here, the plaintiff—"must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 242, 252 & 256-57.

-14-

## B.  STATUTE OF LIMITATIONS

Plaintiff admits that she reported her father's abuse to the police when she was 12 or so and sought counseling a short time thereafter.  But, she claims to have completely blocked the memory of the abuse, the memory of the police investigation and the memory of the counseling sessions.  She claims this complete block occurred during her teenage years and continued uninterrupted well into adulthood.  For the first time as an adult, she claims to have again remembered the abuse on January 8, 2003 in a counseling session.[5]   Affidavits from two (PhD level) licensed psychologists are offered in support of Plaintiff's position.  Essentially, the plaintiff asserts that her age *and* disability have tolled the statute of limitations.

The undisputed evidence indicates that Plaintiff reported her alleged abuse to police investigators on November 8, 1985.  (Filing 213 [Mario Scalora Aff.] at CM/ECF p. 19.)  Plaintiff graphically recited the nature of her abuse to the police officer.  (Id.)  For "several months" thereafter Plaintiff was treated at the Burrell Behavioral Health Center (although the records of that treatment are lost).  (Id.)  Under Nebraska law, Plaintiff's cause of action thus "accrued" no later than November 8, 1985.  Teater v. Nebraska, 559 N.W.2d at 761, 763 (Neb. 1997) (accrual of child abuse cause of action occurred at 14 when the child reported the abuse).

Nebraska law also provides, however, that if you are injured as a child, and even though your cause of action has accrued, the "clock" first begins to run when you turn 21 years of age.  See, e.g., Duffy, 2006 WL 208832, at *2 (discussing Neb. Rev. Stat. Ann. § 25-213 (LexisNexis 2004)).  In addition, Nebraska law tolls the statute of limitation if "at the time the cause of action accrues" the plaintiff is a

---

[5]I do not know whether hypnosis was used to recover Plaintiff's memory or to treat her.  If it was, a serious evidentiary question arises as to whether hypnosis, which can be unduly suggestive, fatally taints the recovered memory.  As I understand it, that question is not raised by the motions for summary judgment.

"person with a mental disorder."  Neb. Rev. Stat. Ann. § 25-213 (LexisNexis 2004)).
That tolling extends until "such disability is removed."  Id.

If age is the only defense, the statute of limitations has long since run on
Plaintiff's claim because the plaintiff was substantially older than 21 when she filed
suit.  But, Plaintiff also relies upon disability.  Vela and the defendants have not
disputed the affidavits filed by Plaintiff's two psychologists.  Both of those
psychologists are licensed and well-trained.  Both examined Plaintiff, and Dr. Brown
specifically tested the plaintiff.

I am aware of no cases applying Nebraska law that contain focused expert
testimony (such as that presented by Dr. Brown) on the question of repressed
memory.  Thus, this case appears to be unique.  In my opinion, the "repressed
memory" illness described by Dr. Brown, a type of amnesia, is a mental disorder of
the type contemplated by the Nebraska statute.  Such an illness truly precludes one
from suing since one cannot elect to bring suit if one cannot remember that one has
been injured.  Compare Duffy, 2006 WL 208832, at *4 (where the plaintiff suffered
abuse as a minor and he simply claimed to have forgotten the abuse and where there
was no expert testimony about his memory being repressed, summary judgment
would be granted).

Unlike other Nebraska cases involving very weak evidence of "repressed" and
"recovered" memories, there is plausible scientific evidence specifically related to the
alleged victim from which a reasonable jury could conclude that Plaintiff has proven
by the greater weight of the evidence that she suffered a mental disorder that actually
prevented her from remembering the alleged sexual abuse when she was a minor, at
the time she turned 21 years of age and until she allegedly remembered the abuse on
January 8, 2003.  This is true even though there is other plausible evidence from
which a reasonable jury could come to the opposite conclusion.  Hence, a trial is
required on the statute of limitations question.  See, e.g., In-Line Suspension, Inc. v.

-16-

Weinberg & Weinberg, P.C., 687 N.W.2d 418 (Neb. Ct. App. 2004) (when tolling of the statute of limitations depended on disputed facts, question whether statute was tolled was jury question and "trial court did not err in refusing to decide the statute of limitations issue as a matter of law". )

## C.  NEGLIGENCE CLAIMS AGAINST CHURCHES

Plaintiff asserts that Fellowship and New Hope were negligent in hiring and supervising Vella.  She also asserts that the churches breached some duty to warn regarding Vella.[6] The churches have moved for summary judgment on the merits of these negligence claims.[7]

It is hornbook law that the elements of negligence are duty, breach, injury, and causation.  See, e.g., Stahlecker v. Ford Motor Co., 667 N.W.2d 244, 252-53 (Neb. 2003) (To prevail on a negligence claim, "a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty.").  The ability to "foresee" danger to others relates to "both duty and proximate cause." Id. at 253.

Based upon the undisputed material facts, I conclude that the churches are not liable in negligence to Plaintiff.  There was no breach of duty and no causation.

_____

[6]Plaintiff responded to the motions for summary judgment with briefs and a motion for leave to amend the complaint to add allegations that Fellowship and New Hope breached a fiduciary duty to Plaintiff and are vicariously liable for Vella's intentional conduct toward Plaintiff.  (Filing 214.)  Judge Piester denied leave to amend the complaint.  (Filing 221.)  There has been no appeal.  Accordingly, I do not address the fiduciary duty and vicarious liability arguments raised in Plaintiff's briefs, as they are not properly before the court.

[7]As previously noted, Gordon Vella did not move for summary judgment on the merits of the negligence claim.

### *Duty and Foreseeability*

The duty in a negligence case "is always the same–to conform to the legal standard of reasonable conduct in the light of the apparent risk." Schmidt v. Omaha Pub. Power Dist., 515 N.W.2d 756, 763 (Neb. 1994) (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53 at 356 (5th ed. 1984)). Foreseeability impacts determination of duty in that "'the risk reasonably to be perceived defines the duty to be obeyed . . . .'" Stahlecker, 667 N.W.2d at 608 (quoting Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 342, 162 N.E. 99, 100 (1928) (Cardozo, J.)). Whether there is a legal duty under particular facts is a question of law. Fu v. Nebraska, 643 N.W.2d 659, 673 (Neb. 2002.) ("Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.").

The Nebraska Supreme Court has recognized claims for both negligent hiring and negligent supervision. However, the Court has never articulated a clear test or set of elements that can be universally applied. See, e.g., Kime v. Hobbs, 562 N.W.2d 705 (Neb. 1997) (negligent hiring); Schieffer v. Catholic Archdiocese of Omaha, 508 N.W.2d 907 (Neb. 1995) (negligent supervision); Christianson v. Educational Serv. Unit No. 16, 501 N.W.2d 281 (Neb. 1993) (negligent hiring); Greening v. School Dist. of Millard, 393 N.W.2d 51 (Neb. 1986) (negligent hiring); Strong v. K&K Inv., Inc., 343 N.W.2d 912 (Neb. 1984) (negligent supervision); Farr v. Cambridge, Co-Op. Oil Co., 81 N.W.2d 597 (Neb. 1957) (negligent supervision).

The courts typically utilize a "knew or should have known" standard to determine whether an employer is negligent in either hiring or supervising an employee. Indeed, Nebraska law holds that a person charged with negligence must have had knowledge of or be reasonably chargeable with knowledge that the act or omission occasioned danger to another. See McClure v. Forsman, 662 N.W.2d 566 (Neb. 2003); Burns v. Veterans of Foreign Wars, 438 N.W.2d 485 (Neb. 1989); Wilson v. F&H Constr. Co., 428 N.W.2d 914 (Neb. 1988); Nebraska Jury Instructions

2d Civ. § 3.02 at 175 (2005 ed.) ("Negligence is doing something that a reasonably careful person would not do under similar circumstances, or failing to do something that a reasonably careful person would do under similar circumstances."). The risk that a reasonably careful person would perceive (foresee in legal parlance) shapes the duty in a particular circumstance.

For purposes of the churches' motions for summary judgment, it is established that Vella engaged in sexual intercourse and other inappropriate sexual contact with his prepubescent daughter, beginning when she was age three and continuing through age twelve. This is the essence of the unusual behavior known as pedophilia. Diagnostic and Statistical Manual of Mental Disorders (4th ed.) 527 (Pedophilia involves sexual activity with a prepubescent child (generally age 13 years or younger)). Some pedophiles are sexually attracted to children and others are also attracted to adults. Id. A prepubescent child is, by definition, not sexually mature.[8]

I assume that the churches had a duty to exercise due care in hiring and supervising Vella in order that they not put a pedophile in the pulpit. I also assume that they had a duty to warn the congregation of reasonably foreseeable harms from their employee had they known he was a pedophile. With that assumed, Plaintiff has tried mightily, but she has failed, to make a triable case that Vella's sexual abuse of his young child was foreseeable by the churches.

Plaintiff relies upon "ample red flags to the character of Vella" and asserts that the churches knew or should have known that Vella "was sexually promiscuous and

---

[8]Puberty is "the condition of being or the period of becoming first capable of reproducing sexually marked by maturing of the genital organs, development of secondary sex characteristics, and in the human . . . by the first occurrence of menstruation in the female." Webster's Third New International Dictionary, Unabridged 1835 (1986).

predatory." (Filing 221, Br. Opp. Fellowship Mtn. for Summ. J. at 1, 20.) The "red flags" are these:

      (1) Vella's inappropriate contact with teenaged Fellowship parishioner Sarah Logan;

      (2) Vella's inappropriate contact with another teenaged Fellowship parishioner, Angel Niedfeld;

      (3) Vella's indecent exposure to an adult woman seamstress, for which he was criminally convicted;

      (4) Vella's multiple extramarital affairs with consenting adult women (one of them an employee of Fellowship); and

      (5) Vella's inappropriate contact with a teenaged babysitter when he lived in Missouri, prior to his hiring by Fellowship.

Although it is doubtful, I assume that both Fellowship and New Hope "knew" or "should have known" of some or all of the so-called "red flags." But, as I shall next demonstrate, that is not enough.

The problem for Plaintiff is that facts which might raise a "red flag" about a risk of inappropriate sexual conduct with teenage females or adult women would not cause reasonably prudent churches to worry that someone would engage in the very different and aberrant behavior of molesting small children. Indeed, Vela's wife had no such clue or concern. Thus, the defendants breached no "duty" to protect the plaintiff from her father. Van Osdol v. Vogt, 892 P.2d 402, 408 (Colo. App. 1994) (knowledge that a minister engaged in extramarital affair with a parishioner at former church did not create duty on part of employer church to foresee minister's sexual abuse of his minor stepdaughter), remanded on other grounds, 908 P.2d 1122 (Colo. 1996) (finding that several claims brought by stepdaughter were barred by First Amendment). See also N.H. v. Presbyterian Church (U.S.A.), 998 P.2d 592, 600

(Okla. 1999) (when minor children who were sexually abused by a minister brought respondeat superior and negligent hiring, retention and supervision claims against the national church organization which employed the minister, summary judgment for the church organization was affirmed, as the church had no "prior knowledge of [the minister's] propensities to create the <u>specific danger</u> resulting in damage.") (emphasis added); <u>Wood ex rel. Doe v. Astleford</u>, 412 N.W.2d 753, 756-57 (Minn. Ct. App. 1987 ) (employer not liable in negligence to young boys depicted in pornographic photographs taken at employer's place of business although employer knew the employee was "playing with little kids"; court found that the facts known to the employer did not "identify <u>specific aberrant behavior</u> or indicate that . . . juvenile males were particular victims" and "[w]hen an employer has no notice of an employee's <u>specific aberrant behavior and the specific targets of his proclivities</u>, the risk is so speculative that no duty to warn arises.") (emphasis added).[9]

### *Causation and Foreseeability*

Proximate (direct) cause is also affected by foreseeability.  <u>Stahlecker</u>, 667 N.W.2d at 608; <u>Nebraska Jury Instructions 2d Civ.</u> § 3.41 at 217 (defining proximate cause as "a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred," and observing that "there must be some reasonable connection between the act or omission in question and the

---

[9]To the extent Plaintiff seeks to impose liability for negligent supervision, she must of necessity assert that the churches had a duty to supervise their employee-minister in his own home.  However, a church's obligation to supervise its employee-minister does not extend to close supervision of the minister's conduct in his own home, even if that home is provided by the church, as the minister retains rights of privacy and quiet enjoyment in the home.  <u>Napieralski v. Unity Church of Greater Portland</u>, 802 A.2d 391, 393 (Me. 2002) (holding that even if Maine recognized the tort of negligent supervision, a church has no right [and thus no duty] to closely supervise minister engaged in private activities in church-provided home).

damages sued upon."). <u>See also</u> <u>Christianson v. Educational Serv. Unit No. 16</u>, 501 N.W.2d 281 (Neb. 1992) (dismissing a petition that failed to advise defendants how negligent retention of certain employees proximately caused plaintiff's claimed injuries). Although causation is ordinarily a question of fact, "where only one inference can be drawn, it is for the court to decide whether a given act or series of acts is the proximate cause of the injury." <u>Stahlecker</u>, 667 N.W. 2d at 258 (Neb. 2003).

Among other requirements, to establish proximate cause a plaintiff must prove that the injury would not have occurred "but for" the negligence. As to this "but for" requirement, "the defendant's conduct is not a cause of the event if the event would have occurred without it." <u>Stahlecker</u>, 667 N.W.2d at 254 (<u>quoting</u> <u>Haselhorst v. Nebraska</u>, 485 N.W.2d 180, 187 (1992)).

Here, it is undisputed that Vella began abusing Plaintiff three years *before* the family moved to Lincoln and he became pastor of Fellowship. It is equally undisputed that the sexual abuse continued for nearly two years *after* he left Fellowship (when Vella was pastor of New Hope). The abuse ended when Gail Vella and the children left Vella and moved away from Nebraska. Plaintiff herself acknowledges that Vella's position of parental (not pastoral) authority allowed him to continue to sexually abuse her, and that during the times he sexually abused her, Vella was acting as her father and not as her pastor. (Fellowship Facts 21, 52.) Still further, the abuse took place in the secrecy of the family home or on a family outing, a place or activity over which the churches had no authority.

On these facts, Vella's secret and ongoing abuse of Plaintiff in the privacy of the family home or during a family outing is causally unrelated to any negligent act or omission of the churches regarding Vella. No matter what the churches might have done, they could not have protected Plaintiff from the claimed predations of her father.

### D.  FIRST AMENDMENT ISSUES

Because federal courts are required to avoid unnecessary and broad adjudication of constitutional issues, I do not reach the merits of the defendants' assertions that the First Amendment bars this suit.  See Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."); American Foreign Serv. Ass'n v. Garfinkel, 490 U.S. 153, 161 (1989) (district court should not pass on constitutional question unless it was "imperative" on remand in case involving statute which precluded use of appropriated funds to implement or enforce nondisclosure agreements signed by Executive Branch employees; "courts should be extremely careful not to issue unnecessary constitutional rulings").

## III.  CONCLUSION

The undisputed facts establish that neither Fellowship nor New Hope is liable in negligence for Vella's sexual abuse of his daughter in family settings.  Neither church could foresee that Vella would sexually abuse Plaintiff and the abuse was not causally connected to his employment as a pastor.

Yet to be determined is whether Vela is liable to his daughter and whether the statute of limitations was tolled on Plaintiff's tort claims against her father.  Those questions are for a jury to decide.

The affidavits from the psychologists create triable issues of fact as to whether the statute of limitations was tolled even though Plaintiff, when she was a minor, once knew about and reported the alleged sexual abuse and received counseling for that

abuse. Tentatively,[10] I would frame these triable issues regarding the statute of limitations this way:

> Following Plaintiff's report to the police on November 8, 1985, and sometime before Plaintiff was 21 years of age, did Plaintiff suffer from a mental disorder that actually prevented her from remembering the alleged sexual abuse?

> If so, did the mental disorder persist and actually prevent Plaintiff from remembering the alleged sexual abuse at the time she turned 21 years of age and continuously thereafter until she allegedly remembered the abuse on January 8, 2003?

For the foregoing reasons,

IT IS ORDERED that:

1.    The motions for summary judgment (by Fellowship, filing 171; by New Hope, filing 183; and by Gordon Vella, filing 185 (only on the question of the statute of limitations)) are granted in part and denied in part as follows:

> a.    The motions for summary judgment made by Fellowship, New Hope and Gordon Vella on the issue of the statute of limitations are denied; and

> b.    The motions for summary judgment made by Fellowship and New Hope are granted on the merits of the negligence claims.

---

[10]I am tentative because I want the wise counsel of the lawyers about how exactly to phrase the questions before I submit them to a jury.

2.    Yet to be determined is whether the statute of limitations was tolled on Plaintiff's tort claims against her father, and whether her father is liable to Plaintiff on the merits of those alleged torts.  Those questions are for a jury to decide.

3.    A Fed. R. Civ. P. Rule 54(b) judgment for the two churches shall be entered by separate order.

May 15, 2006                                    BY THE COURT:

                                               *s/Richard G. Kopf*
                                               United States District Judge